IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * C.R. NO. 08-02T
*
UNITED STATES OF AMERICA *
* May 28, 2008
VS. * 10:23 A.M.
*
FELIPE ARIAS *
*
* * * * * * * * * * * * * * * * PROVIDENCE, RI

BEFORE THE HONORABLE ERNEST C. TORRES,

SENIOR JUDGE

(Defendant's Motion to Suppress Evidence)

FOR THE GOVERNMENT:

ZECHARIAH CHAFEE, AUSA
U.S. Attorney's Office
Fleet Center
50 Kennedy Plaza
8th Floor
Providence, RI 02903

FOR THE DEFENDANT:

MARY S. McELROY, ESQ.
Federal Public Defender's Office
10 Weybosset Street
Suite 300
Providence, RI 02903

Court Reporter: Debra D. Lajoie, RPR, FCRR, CRI

Proceeding reported and produced by computer-aided stenography

* * * * *

**DIRECT EXAMINATION BY MR. CHAFEE**

Q. Who do you work for, sir?
A. Providence Police Department, sir.
Q. And what is your role with the Department?
A. I'm a Patrol Officer on the out-first shift, 3:00 to 11:00.
Q. Calling your attention to--
THE COURT REPORTER: Excuse me. I'm sorry. On the what shift?
THE WITNESS: The out-first shift, from 3:00 to 11:00
MR. CHAFEE: Officer Vieira, I don't think you need to bend down to the microphone each time you speak. If you could just speak that in a loud voice, the mic. will pick it up.
THE WITNESS: Yes, sir.
MR. CHAFEE: So speak up.
Q. Calling your attention to November 27th, 2007, were you working for the Department at that time?
A. Yes, I was, sir.
Q. As a Patrol Officer?
A. Yes, sir.
Q. Calling your attention to about 8:53 in the evening, were you on patrol on that-- at that time, on that date?

A. Yes, I was, sir.
Q. Were you in a marked or unmarked car?
A. I was in a marked vehicle, sir.
Q. So that's a regular Police vehicle with overhead lights, is that right?
A. Yes, sir.
Q. And Providence Police markings on the side?
A. Yes.
Q. And were you alone in the car, or were you with other officers?
A. I was alone, sir.
Q. And what-- at about that time, what street were you on?
A. I was on Reynolds Ave. heading westbound.
Q. Is that in South Providence?
A. Yes, sir.
Q. Is the area one that-- known to the Providence Police as being a high-crime sort of area?
MS. McELROY: Objection.
THE COURT: Grounds?
MS. McELROY: Judge, there's no foundation. But it's also leading, and I think, at this point, irrelevant.
THE COURT: Well, it may not be relevant, but I'll allow it. We'll see where this fits in. Overruled.
A. Yes, it is, sir.
Q. Let's see. So you were on patrol. And what did you

see at around 8:53 in the evening as you're driving along Reynolds Avenue in South Providence?

A. As I was coming up Reynolds Ave., sir, heading westbound, I observed a white Subaru in front of me, heading towards me, make a left in to a driveway and then proceed to do a three-point turn and head back the same direction as I was heading. So I ended up following the vehicle, sir.

Q. Was it a white Subaru wagon, or was it a sedan?

A. It was a wagon, sir.

Q. Did the Subaru wagon make a turn?

A. It made a-- after it made the three-point turn, it made a left-hand turn on to Ocean Street, sir.

Q. Did he use his turn signal?

A. He did not, sir. There was no way. It was-- it couldn't work.

Q. When you say it couldn't work, how do you know that?

A. It was inoperable, from what I could tell. It seemed to be smashed out on the left side, the tail light and the turn signal itself.

Q. Tail light and turn signal smashed out, okay.

So, then, as he-- what light-- what street did he turn left on?

A. That was Ocean Street, sir, he took the left on to.

Q. And could you tell, at that point, was there more than just the driver in the white Subaru?

A. Yes, sir, there was, I believe, three occupants.
Q. So, as the-- as he turned on to-- what was the road again?
A. Ocean Street.
Q. -- Ocean Street, and then did he make another turn?
A. Yes, sir. He made a right-hand turn on to Potters Avenue.
Q. Okay. And when he turned on to Potters Avenue, what did you do?
A. I then began to run the vehicle information through Channel--
Q. When you say run the vehicle information, what does that mean?
A. I contacted-- excuse me. I used my computer, and I ran the vehicle's registration to find out where it was from, if it was possibly stolen, if it was unregistered.
Q. Anything come back in that regard from your computer?
A. The vehicle did come back registered.
Q. Okay. What did you do-- did he make another turn from Ocean Street?
A. From Ocean Street, we took a right-hand turn on to Potters Avenue.
Q. On to Potters Avenue, okay.
On Potters Avenue, what did you do?
A. I continued to follow the vehicle for a short distance.

We reached the intersection of Potters Ave. and Prairie Ave. He did come to a complete stop. We went through the--
Q. When he came to a complete stop at that intersection?
A. Yes, sir.
Q. Okay. And then what happened?
A. We then went through the intersection, and that's when I stopped him at the corner of Potters Ave. and Croyland.
Q. And by stopping him, how did you indicate that he was supposed to-- that he, the driver of this car, was supposed to stop the car?
A. I turned on my overhead flashing red and blue lights. I also turned on my take-down lights, which are just the spotlights at the top of the vehicle.
Q. When you say take-down lights that are on the top of the vehicle, are those white lights?
A. Yes, sir.
Q. And where do they shine?
A. They shine directly in to the rear of the vehicle, illuminating the whole vehicle, sir.
Q. The vehicle ahead of the Police car, is that right?
A. That's correct, sir.
Q. And did you do anything with your left-side-mounted spotlight?
A. Yes, sir. I turned it on, and I shined it in to the rear view mirror and on the driver of the vehicle, sir.

Q. Is it a motor vehicle infraction not to have a turn signal?

MS. McELROY: Objection.

THE COURT: Foundation?

MS. McELROY: Yes.

THE COURT: Sustained. First we need to know if the Officer knows what the motor vehicle requirements are.

Q. Are you familiar with the motor vehicle requirements, Officer, due to your time on the force?

A. Yes, sir. For a turn signal?

Q. For a turn signal, yes.

A. Yes, sir. If you're going to make any type of turn, may it be a left or a right, you need to use your directional signal in the State of Rhode Island. I know that, sir.

Q. All right. And he had failed to do that, is that right?

A. When he made the left on to Ocean Street, is that what you're referring to?

Q. Yes.

A. Yes, sir.

Q. And did he also have a broken-out turn signal?

A. Yes, sir.

Q. What side was that on?

A. That was on the left-hand side, sir.

Q. And is he required to have a turn signal to indicate he should turn left?
A. Yes, sir, he is required to.
Q. Was that left-hand brake light also broken out?
A. Yes, sir.
Q. So you stopped him, and you shone these lights-- him, by him, I'm talking now about the driver of the car, you understand that? All right.
Now, your lights are shining in to the white Subaru wagon, the overhead spotlight and the spotlight to the left of your door, your driver's door. What did you do?
A. I stopped my vehicle, I proceeded to get out of my vehicle, and I observed the front right passenger of the vehicle leaning forward in to his seat as if he was leaning down--
Q. All right. Bending from the waist down forward?
A. Yes, sir.
Q. Did you yell anything?
A. I yelled for all the occupants in the vehicle to show me their hands.
Q. And could you see at that time how many people were in the car?
A. Yes, sir. There was three occupants.
Q. All right. The driver, obviously, and which seat was-- the man who was bending from the waist forward, what seat

was he sitting in?
A. He was in the front passenger's seat, sir.
Q. All right. And there was a third man? And where was he?
A. He was in the rear seat behind the driver, sir.
Q. All right. So you yelled for the occupants of the car to do what?
A. To show me their hands, put their hands in the air.
Q. Did all three men do that?
A. No, sir.
Q. Did two out of the three do that?
A. Yes, sir.
Q. Who didn't do that?
A. The front right passenger did not show his hands, sir.
Q. What did he continue to do?
A. He continued to lean forward, and he appeared to be fumbling with something. I wasn't quite sure at that time what he was doing, sir.
Q. All right. What did you do when you saw the man fumbling and the other man putting-- other men putting up their hands?
A. I hurriedly made it to the passenger rear wheel, and I--
Q. Okay. Did you call for back-up at any--
A. As I was doing that, I was calling for back-up.

Q. Do you have a radio on your person?
A. I do, sir.
Q. All right. And that's attached to your shirt-- is that right?-- or your jacket?
A. Yes, sir.
Q. So you don't have to use your hands to make a call, or do you have to make a hand--
A. No. I do, sir. I usually use my left hand.
Q. All right. So you made the call for back-up. How long did that take?
A. Not even a minute, sir. They were there very quickly.
Q. Do you know what you said, roughly?
A. "Car 223, I'll be out with Rhode Island reds," da, da, da, da, da, whatever it was. I then said, "If I could, could I get a couple of slow cars?"
Q. So when you say reds, you were giving the registration number on the Subaru, is that right?
A. Yes, sir.
Q. Where were you standing when you made that call?
A. I was probably close to the rear bumper as I was making that call, sir.
Q. All right. Which side of the car did you go up on?
A. The passenger's side, sir.
Q. All right. Did you have a light yourself?
A. I did. I had my flashlight, sir.

Q. What did you do with the flashlight?
A. I shined it up-- as I-- before I even got to the rear bumper, my light was already on them. I came to the rear--
Q. On who?
A. On the subjects themselves.
Q. All right.
A. I came to the rear passenger's side. As I made it to about the rear tire where the window is, the rear passenger window, I was shining it on the subject in the passenger's seat--
Q. Front passenger's seat?
A. -- due to what had been going on before I got out of the car.
Q. You mean, is that the leaning forward and the fumbling?
A. Yes, sir.
Q. All right. What did you-- as you looked in with your flashlight and-- what did the man in the front passenger's seat do?
A. He was attempting to shove some type of chrome-colored object towards the side of the door, the passenger's side door. I could see it from where I was standing. I continued to yell for him to show me his hands.
Q. Did he show you his hands?
A. He finally did show me his hands.
Q. What did he do with his hands?

A. He put them straight up in the air and then began to try and talk to me.
Q. When you say he tried to talk to you, was the door open at that point?
A. I had just opened the door, sir.
Q. The front passenger door?
A. Yes, sir.
Q. What did the man in the front passenger's seat say to you?
A. I'm not too sure what he said to me. I just was yelling at him to show me his hands. I said, "You got to show me your hands," you know, I said-- you know, it's dark, it's nighttime. I'm not too sure of the entire conversation, but it was more of a reprimand conversation, me yelling at him.
Q. All right. Do you see the man who was in the front passenger's seat here in Court today?
A. Yes, sir, I do.
Q. Could you indicate him for the record, please?
A. He's sitting in the middle of those two ladies over there at the desk.
Q. Well, is that indicating Defendant sitting between his lawyer and the Court translator?
A. Yes, sir. He's wearing a tan shirt.
MR. CHAFEE: A tan shirt. Indicating Defendant,

Your Honor.

THE COURT: The record may show that the witness has identified Mr. Arias, the Defendant.

Q. What were the other men in the car doing?

A. They obeyed all my commands, sir. Their hands never left the air. They kept their hands in the air the entire time.

Q. When you saw the chrome-colored object being shoved in to the-- what appeared to be the side of the-- inside of the front passenger door, did you hear anything?

A. I could hear a strange sound. It was metal banging on metal. It was a very odd sound, which heightened my senses that something was not right.

Q. Did you think it-- did you have a suspicion it could be a weapon?

A. Yes.

Q. When you had the door open and you were yelling at Arias to show you his hands, did the other cars come?

A. They did-- they did finally showed up-- they-- excuse me. They did finally show up minutes later.

Q. Minutes or seconds?

A. Maybe a minute.

Q. Okay. How many other cars came?

A. I believe there was two other cars, sir.

Q. Well, were these two other marked Police cars?

A. Yes, sir.
Q. And were there Officers in uniform driving those cars?
A. Yes, sir.
Q. How many in each car?
A. One in each car, sir.
Q. What did you do when the Officers, the other Officers, appeared on the scene?
A. I instructed them as to what had took place, and I explained to them that I was going to have all the subjects exit the vehicle for a patdown.
Q. All right. Did you order Arias out of the car?
A. After the-- he was the last one to come out, after the two other subjects were brought out and patted down by the other Officers.
Q. Okay. And were they brought to the right-hand side of the vehicle, to the sidewalk side?
A. Yes, sir.
Q. And patted down by the other Officers?
A. Yes, sir.
Q. So that's the driver and the back seat passenger, is that right?
A. Yes, sir.
Q. And the front passenger door is open this whole time, is that right?
A. Yes, sir.

Q. Did you instruct Mr. Arias to step out of the car?
A. I did instruct him to step out of the vehicle.
Q. And what did he do?
A. He stepped out of the vehicle, and a pair of batting gloves fell out of his lap, sir, to the ground.
Q. A pair of batting gloves. Those are baseball batting gloves, is that right?
A. Yes, sir.
Q. Did that indicate anything to you?
A. In my line of work, it's common knowledge that sometimes subjects will use gloves if they're going to do some type of a shooting in order to keep their fingerprints off of a weapon, sir.

MS. McELROY: Objection, and move to strike.

THE COURT: Denied. You can cross-examine on that point, Ms. McElroy.

Q. Did that heighten your suspicion--
A. Yes, it did, sir.
Q. -- that there was a weapon in the car?
A. Yes, sir.
Q. Did you say anything, or did-- about the batting gloves as the Defendant was getting out of the car, or was there some exchange between you and him about those batting gloves?
A. After they fell to the ground, sir, I asked him what

they were for, and he said he was going to the game.
Q. And this was at 8:00 at night--
A. 9:00 at night.
Q. -- on November 20-- 9:00 at night on November 27th, is that right?
A. Yes, sir.
Q. When he stood up out of the car and the batting gloves fell and he gave you that explanation, what did you do with him?
A. I had him move to his left, to the rear passenger side of the vehicle, so I could conduct a patdown.
Q. Did you pat him down?
A. Yes, sir.
Q. And that's just patting down on the outside of the clothing, is that right?
A. Yes, sir. That's correct.
Q. What was-- where were the other two occupants of the car?
A. They were already against the wall, to the right of the vehicle with their backs to the wall with the other Officers securing them.
Q. When you-- when you're-- when the Defendant, Mr. Arias, was out of the car and had been patted down, what did you say to him?
A. After he had been patted down?

Q. Yeah.
A. I just asked him to step against the wall.
Q. Okay. And that was the wall of a building along the sidewalk, is that right?
A. Yes, sir.
Q. What did you do?
A. As soon as all three were secured, I immediately responded to the area that he was reaching.
Q. When you say responded to, you walked up to the area where--
A. Where the open door was.
Q. The inside of the open door, is that right?
A. Yes, sir.
Q. Open front passenger door, is that right?
A. Yes, sir.
Q. Okay. Describe for the Court the way the inside of that front passenger door looked.
A. It appeared, the way the door was, that there was no interior panel on the door. There was a-- if I had to guess, an eight-inch, factory-carved open speaker hole with no speaker and no obstructions.
Q. So there was a speaker-- a metal-- a hole in the-- of the metal of the door, is that right?
A. That's correct, sir.
Q. As though a speaker was to go in there?

A. That's correct, sir.
Q. A stereo speaker, is that right?
A. That's correct.
Q. But there was no stereo speaker in the hole?
A. There was not, sir.
Q. What did you do with your flashlight?
A. I had my flashlight on the hole, and as I looked in, I could clearly see a chrome-colored handgun. And then, as I looked further, I saw the clip of the handgun.
Q. Just standing outside the door, looking with your flashlight, is that right?
A. I had to lean to the left a little, that was it.
Q. Did you reach in and grab the gun?
A. No, I did not.
Q. Okay. What did you do when you saw the gun, the chrome-colored gun, in the hole in the door?
A. I just was more worried for Officer safety at that point. I walked over to the other Officers that were there. I whispered to the two of them that there was a firearm in the vehicle, and I had each of them restrain a-- or detain a subject, and we put them each in to separate Police vehicles--
Q. All right.
A. -- and handcuffed them.
Q. Had you, at any point, asked the driver of the car--

let's step back a second. We didn't go over this.

But at some point, had you asked the driver of the car to show you his registration?

A. While I was waiting for my back-up, for that brief period of time, just to make some small talk so nobody would be nervous or, you know, to kind of delay them, I asked the driver for his license. And I asked the passenger, the front right passenger to get me--

Q. That's the Defendant?

A. Yes. -- to get me the registration of the vehicle.

Q. All right. And what did the Defendant do at that point?

A. I had him open the glove compartment with his right hand, and he was kind of fiddling through the paperwork to look for a registration for me.

Q. All right. Did you find out who the car was registered to?

A. After the fact. I believe it was registered to the driver.

Q. And his name was Sosa, is that right?

A. I believe so, sir.

Q. And so the car was registered to the driver, is that right?

A. Yes, sir.

Q. And when did you learn that?

A. I think I-- when I originally ran the plate, I believe it came back to the driver's name, but at that point, I didn't know the driver because I hadn't stopped the vehicle yet.

After all was said and done and I was able to sit back and start to filter through the information, I realized that the vehicle belonged to the driver.

Q. Okay. Was there any-- did there come a time-- as you look in with your flashlight in to this hole in the-- speaker hole in the frame of the door, did you see anything besides the gun?

A. There was absolutely nothing there. It was clear as day. There were no obstructions at all, sir.

Q. Was there a magazine?

A. Well, there was a magazine when I looked in further, after I saw the firearm, sir.

Q. Okay. When you-- and I mean a magazine for a gun. I don't mean a reading magazine, right?

A. Yes, sir.

Q. All right. So, after the other people from the-- after the Defendant and the two other men from the car were in Police cars, did you call for BCI?

A. I did, sir.

Q. And that's-- those are the people that do fingerprints?

A. Yes, sir.

Q. All right. And it's common, it's practice to call for BCI when there's a gun that's been--

A. Yes, sir. If they're available, they'll come and retrieve the firearm for chain-of-custody issues.

Q. Were they available? Was BCI available?

A. They were not, sir. They were tied up at that time.

Q. So what did you do?

A. BCI instructed me over the phone to retrieve the firearm to the best of my abilities. I got it. I think I picked it up-- I'm not sure if I grabbed it by the trigger with a pen, but I somehow, without touching it, got it in to a bag, the clip, as well, and I placed it in the front seat of my locked cruiser.

Q. Just to go back over one more thing now, when you looked in the hole, the speaker hole in the door, were you standing outside the car?

A. Yes, sir. The door was open, so I was standing outside the vehicle.

MR. CHAFEE: The door was open, and you were standing outside the car, okay.

I have no further questions.

THE COURT: All right. Ms. McElroy?

MS. McELROY: Thank you.

* * * * *

C E R T I F I C A T I O N

I, Debra D. Lajoie, RPR-RMR-FCRR-CRI, do hereby certify that the foregoing pages are a true and accurate transcript of my stenographic notes in the above-entitled case.

/s/ Debra D. Lajoie

6/2/08